*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*





★ ★ ★      ★ ★ ★

# OPINION

No. 04-09-00397-CV

George **LESIEUR**,
Appellant

v.

Timothy **FRYAR**, Sandra Fryar, Cynthia Morales d/b/a Morales Realty, and Cynthia Gonzales,
Appellees

From the 38th Judicial District Court, Medina County, Texas
Trial Court No. 07-07-18515-CV
Honorable Mickey R. Pennington, Judge Presiding[1]

Opinion by:    Marialyn Barnard, Justice
Dissenting opinion by: Phylis J. Speedlin, Justice

Sitting:       Sandee Bryan Marion, Justice
              Phylis J. Speedlin, Justice
              Marialyn Barnard, Justice

Delivered and Filed: July 14, 2010

AFFIRMED IN PART, REVERSED AND RENDERED IN PART

This appeal arises out of a real estate sale in Medina County, Texas. Appellant George

Lesieur, the buyer, brought suit against the sellers, Timothy and Sandra Fryar, and the Fryars' real

estate agents, Cynthia Morales d/b/a Morales Realty and Cynthia Gonzalez, alleging claims for fraud,

---

[1] The summary judgment order on the substantive claims brought by George Lesieur was signed by the Honorable Mickey R. Pennington, former presiding judge of the 38th Judicial District Court, Medina County. The summary judgment order on the counterclaim for attorney's fees brought by Cynthia Morales d/b/a Morales Realty and Cynthia Gonzales was signed by the Honorable Camille Glasscock Dubose, who became the presiding judge of the 38th Judicial District Court of Medina County following Judge Pennington's retirement.

violations of the DTPA, negligence, negligent misrepresentation, and civil conspiracy. In essence, Lesieur claimed the sellers and the real estate agents misrepresented and concealed defects in the home prior to Lesieur's purchase. The trial court granted the traditional and no evidence motions for summary judgment filed by the Fryars, Morales, and Gonzales, thereby ruling that Lesieur take nothing on his claims. Thereafter, the trial court granted summary judgment in favor of Morales and Gonzales on their counterclaim for attorney's fees. The trial court also granted a motion for severance, making the judgment final for purposes of appeal.[2] On appeal, Lesieur raises four issues, challenging all of the orders in this case. We affirm the trial court's order granting summary judgment in favor of the Fryars, Morales, and Gonzales on Lesieur's substantive claims, but reverse and render judgment in favor of Lesieur on the issue of attorney's fees.

## BACKGROUND

In 2002, Timothy and Sandra Fryar purchased a house and surrounding property in Medina County, Texas. Cynthia Morales d/b/a Morales Realty and Cynthia Gonzales (collectively "Morales Realty") had listed the property on behalf of Jerry and Gloria Kane. Before the purchase, the Fryars hired Adams Home Inspection Company to inspect the house. According to the report generated as a result of the inspection ("the Adams Report"), the foundation of the house showed "[s]igns of structural movement," but was supporting the house. As evidence of structural movement, the inspector noted "[c]racks in walls and/or ceilings," "[d]oor frames out of square," and "[c]racks in brick/stone veneers." However, the inspector did not check the box that would have advised the

---

[2] Lesieur brought suit against others as well; however, they are not parties to this appeal because they have either settled with Lesieur or have otherwise been dismissed.

foundation was "Not Functioning or In Need of Repair." The Fryars purchased the home, and admittedly made no repairs.

In 2005, the Fryars decided to sell the house and property, and hired Morales Realty to list it. Lesieur was interested in purchasing the house and property, and the parties began to take steps to conclude a sale. On June 28, 2005, Lesieur and his wife[3] entered into a "Farm and Ranch Contract" ("the contract") with the Fryars for the sale of the property. The contract set the closing date for July 28, 2005.

The contract noted that a "Seller's Disclosure Notice" ("the disclosure") had been provided to Lesieur. Within the disclosure, the Fryars were required to note defects, malfunctions, or conditions of which they were aware. They noted no problems with the foundation, walls, floors, or ceilings. The Fryars also disclaimed receiving any written inspection reports from any licensed inspector within the last four years. This was despite the Adams Report the Fryars admittedly received in 2002, which was maintained in their real estate file by Morales Realty.

The contract allowed Lesieur to have the property inspected by a licensed inspector of his choice. In accordance with this contract provision, Lesieur hired National Property Inspection to conduct an inspection of the house. As a result of the inspection, the inspector generated a report ("the NPI Report"). The NPI Report lists the client as the Lesieurs, and described numerous problems in the section of the report applicable to "Structural Systems," which included the foundation, floors, walls, ceilings, doors, windows, the roof, and carport. The report specifically noted "[s]tress cracks" in the floor tile in the carport and inside the house. The inspector noted these

---

[3] Diana Lesieur signed the documents evidencing the purchase of the property. However, the suit was filed by Lesieur individually.

cracks were "observed both through the tile as well as in the grout joints." The inspector opined that "[t]hese types of cracks usually reflect what is occurring on the slab itself." "Stress/settlement cracks" or "[s]ettlement cracks" were also observed in the interior and exterior walls, and the ceiling. Just as the inspector who prepared the Adams Report, the NPI inspector did not check the box that would have advised the foundation was "Not Functioning or In Need of Repair."

Lesieur, who was represented by his own real estate agent and attorney, was advised by his realtor to review the inspection report, concentrating on safety and structural issues. The realtor also reminded Lesieur that pursuant to the contract he had a ten-day option to terminate the contract, and noted the expiration date. Lesieur testified in his deposition that he reviewed the report, and decided on the repairs he wanted the Fryars to complete. Lesieur never contacted the inspector or spoke to him about the report. As a result of the inspection, an amendment to the contract was signed, requiring numerous repairs or treatments. However, there was no mention of repairs to the foundation, or to any cracks observed during the inspection, despite the advice from Lesieur's realtor to focus on structural problems. Lesieur admitted he saw the inspector's comments regarding the foundation and the various cracks throughout the house, but did not talk to the inspector about these issues, and felt comfortable proceeding with the closing. Lesieur stated he believed the problems noted were "cosmetic."

In addition to hiring his own inspector, Lesieur and his wife completed a walk-through of the house before the closing. They signed a "Buyer's Walk-Through and Acceptance Form" on the day of, but prior to, the closing. At the closing, the Fryars and the Lesieurs met for the first time. Both were represented at the closing by their own realtors and attorneys.

Lesieur moved into the house approximately two months after the closing. Shortly after he moved in, he began to notice signs of possible foundation problems. Lesieur hired Olshan Foundation Repair Company ("Olshan") to conduct another inspection. The Olshan inspector claimed the foundation needed repair, and "there was an attempt to conceal signs of damage to the foundation of the home" by taping and floating cracks in the drywall of interior walls, and covering up exterior cracks with mortar. The inspector did not say who concealed the alleged evidence of foundation damage, or when it might have occurred.

After receiving the report from Olshan, Lesieur filed suit against the Fryars and Morales Realty, among others, alleging violations of the DTPA, common law fraud, statutory fraud pursuant to section 27.01 of the Texas Business and Commerce Code, civil conspiracy, negligence, and negligent misrepresentation. His claims were based, for the most part, on the alleged concealment of the Adams Report and the foundation problems he contends were noted therein. Lesieur claimed he was fraudulently induced into the contract in at least three particulars. First, the Fryars knowingly misrepresented on the Seller's Disclosure that they knew of no defective conditions with regard to the property. This representation was made despite the fact that the Fryars had the Adams Report, which noted conditions that could potentially affect the foundation, which they admittedly never repaired. Second, both the Fryars and Morales Realty knew about the Adams Report, yet concealed its existence, with the Fryars going so far as to deny any inspection had been conducted in the last four years. According to Lesieur, Morales Realty knew about the Adams Report, had a copy in their files, and knowingly passed the Fryars' false disclosure statement onto him without revealing the existence of the Adams Report and the foundation problems noted therein. And finally, apart from the false representations in the disclosure statement and the concealment of the Adams inspection

report, Lesieur claims the Fryars took steps to conceal the damage to the house so it would not be discovered by a buyer or during a visual inspection.[4] The Fryars and Morales Realty responded with general denials, defenses, and claims for attorney's fees.

Ultimately, both the Fryars and Morales Realty moved for summary judgment on both traditional and no evidence grounds as to Lesieur's claims. Morales Realty also filed a motion for summary judgment seeking attorney's fees. The trial court rendered judgment granting the Fryars' and Morales Realty's traditional and no evidence motions for summary judgment without stating the grounds therefor. The court thereafter granted Morales Realty's motion for summary judgment as to attorney's fees, and awarded Morales Realty trial attorney's fees and contingent appellate attorney's fees. Lesieur perfected this appeal.

## ANALYSIS

### Standard of Review

The Fryars and Morales Realty filed both traditional and no evidence motions for summary judgment as to Lesieur's claims, and the trial court, according to the language in its order, granted both. However, because we find the ruling on the traditional motions dispositive, we only recite the standard of review applicable to traditional motions for summary judgment. Courts review a traditional motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A traditional motion for summary judgment is granted only when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law on the grounds expressly set forth in the motion. *Browning v. Prostok*, 165 S.W.3d 336, 344

---

[4] Lesieur also asserted claims based on an alleged landfill and hazardous materials on the property, but on appeal, has limited his arguments to the claims based on the concealment of foundation defects.

(Tex. 2005). When reviewing an order granting a traditional motion for summary judgment, courts take evidence favorable to the nonmovant as true and indulge every reasonable inference from the evidence in favor of the nonmovant. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

### *Lesieur's Pre-Purchase Inspection*

The Fryars and Morales Realty moved for traditional summary judgment on two grounds. First, they asserted Lesieur could not recover on any of his claims because he purchased the property "as is," thereby negating the elements of causation and reliance in all of his claims as a matter of law. Second, they asserted they were entitled to judgment as to all of Lesieur's causes of action because Lesieur's pre-purchase inspection negated the elements of causation and reliance as a matter of law. We express no opinion as to whether the "as is" clause precludes Lesieur's recovery. However, we hold Lesieur's pre-purchase inspection, and the information he obtained as a result, negates the elements of causation and reliance as a matter of law, thereby precluding recovery on any of his claims.

This court recently addressed this issue in *Lim v. Lomeli*, No. 04-06-00389-CV, 2007 WL 2428078, at *1 (Tex. App.—San Antonio Nov. 28, 2007, no pet.) (mem. op.). In *Lim*, this court was asked to decide whether a buyer's pre-purchase professional inspection negated the elements of reliance and causation as a matter of law. *Id.* at *3. The facts in *Lim* show the Lims, as buyers, and the Bakers, as sellers, executed a contract, which included a ten-day termination option. *Id.* at *1. During the option period, the Lims hired a licensed inspector to inspect the house. *Id.* The inspector's report listed several findings relating to water damage throughout the house. *Id.* Lomeli, the Lim's realtor, met with the inspector to discuss the findings, and then met with Mrs. Lim. *Id.*

According to Mrs. Lim, Lomeli told her "'not to worry'" about the wood rot and possible water penetration noted in the inspector's report because these were "'minor'" issues. *Id.* Lomeli's only concern was a large picture window, which he suggested should be repaired. *Id.* The Bakers agreed to pay the Lims for the window in lieu of repairing it. *Id.* Lomeli then advised the Lims to close on the sales contract. *Id.* The Lims claimed they relied on Lomeli's representations and purchased the home. *Id.*

Two weeks after closing, there was a heavy downpour, and the Lims claimed nearly every window leaked and "vast amounts of water ran down the walls, puddled on the window sills, and stained the carpet." *Id.* The Lims brought suit against everyone involved in the transaction, including Lomeli. *Id.* As to Lomeli, they alleged negligent misrepresentation, fraudulent inducement, fraud, DTPA violations, breach of the duty of good faith and fair dealing, breach of fiduciary duty, negligence, and negligence per se. *Id.* Lomeli filed traditional and no evidence motions for summary judgment, which the trial court granted. *Id.*

On appeal, the Lims argued the trial court erred in granting summary judgment based on Lomeli's assertion that the Lims' professional inspection negated the elements of reliance and causation as a matter of law. *Id.* at *3. On review, this court noted the summary judgment record showed the Lims' inspector left dots of paper in the home to notify the Lims of where he saw problems with possible water penetration, and issued a report to the Lims, noting water penetration issues among other things. *Id.* at *3-*4. The Lims also received an inspection report from the Bakers, which indicated prior water penetration problems. *Id.* at *4.

This court held that because the information from the inspection report was equally available to the Lims, causation and reliance were negated as a matter of law. *Id.* The Lims failed to present

more than a scintilla of evidence that Lomeli "*knew anything more or different than [they] did about the condition of the home.*" *Id.* (emphasis added). Accordingly, we affirmed the summary judgment. *Id.*

Based on *Lim*, the issue in this case is whether the Fryars and Morales Realty knew "anything more or different" about the foundation based on the Adams Report, which was withheld from Lesieur, than Lesieur did based on his own inspection report. *See id.* To make this determination, we conducted a side-by-side comparison of the information contained in the Adams Report and the NPI Report, as it related to the foundation and potential evidence of defects[5]:

---

[5] The initials in the first columns denote whether the listed item was "Inspected" ("I"), "Not Inspected ("NI"), "Not Present" ("NP"), and/or "Not Functioning or in Need of Repair" ("R"). All of the written descriptions contained in this table were included under the "Structural Systems" heading in both reports.

| **ADAMS REPORT**<br>(Report Prepared for the Fryars) | **NPI REPORT**<br>(Report Prepared for Lesieur) |
|---|---|
| Y NI NP R<br>☒ ☐ ☐ ☐ | Y NI NP R<br>☒ ☐ ☐ ☐ |
| **1.0 FOUNDATIONS** | **1.0 FOUNDATIONS** |
| **Performance Opinion**:<br>Signs of structural movement noted, however, the foundation is supporting the structure at this time.<br><br>**Evidence of Structural Movement Noted**:<br>Cracks in walls and/or ceilings.<br>Door frames out of square.<br>Cracks in brick/stone veneers. | Stress cracks were observed in the floor tile at Carport area and inside house in spots. these cracks were observed both through the tile as well as in the grout joints. These types of cracks usually reflect what is occurring on the slab itself. No structural cracks were observed around the perimeter of the structure in those areas that were clearly visible. Recommend active monitoring of foundation and structure along with soil moisture maintenance. Visibility was limited due to plant growth in spots. |
| **Walls (Interior and Exterior)**<br>*Comments:*<br>**Interior Walls:**<br>Walls have been recently painted. This tends to hinder the inspection findings. Signs of previous repairs to the wall (Left front bedroom)<br>**Exterior Walls:**<br>The brick/stone siding/veneer and/or mortar is cracked. (Right side, front) | **WALLS (interior and Exterior)**<br>Interior - Stress/settlement cracks were observed on walls in various spot[s] throughout the house, example inside corners of Bedroom, over Bedroom window, Family room.<br>Exterior - Settlement cracks were observed in mortar joints of stonework in spots around the house. |
| **Ceilings and Floors**<br>*Comments:*<br>**Interior Ceilings:**<br>Cracks noted in the ceiling(s). (Front center bedroom)<br>Noted evidence of previous repairs to the ceiling(s) (Hallway)<br>**Floors:**<br>The floors are visibly unlevel. (Left front bedroom) | **CEILING AND FLOORS**<br>Comments:<br>Ceiling - Stress/settlement cracks were observed in spots, example Hallway, Bedrooms. Corner beads were crack in spots of trey ceilings.<br>Floors - Stress cracks were observed in the floor tile inside house in spots. These cracks were observed both through the tile as well as in the grout joints. |
| **Doors (Interior and Exterior)**<br>*Comments:*<br>The door is rubbing on the door frame and is hard to close. (Left front bedroom) | **DOORS (Interior and Exterior)**<br>Comments: Interior - Bedroom closet door sticks at top. |

Based on our review of the pertinent portions of the reports, it is evident that the differences between the reports are merely a matter of word usage, not substance. Obviously, some of the words

used by the inspector in the Adams Report are slightly different than those in the NPI Report. The most notable example of this is the reference in the Adams Report to "structural movement," a phrase not used in the NPI Report. However, the inspector who prepared the Adams Report specifically described the evidence of structural movement as cracking in the walls, ceilings, and in the brick/stone veneers, as well as the fact that a door frame was "out of square." In the NPI Report, the inspector noted this same cracking, but specifically referred to it as "stress" or "settlement" cracking. He also noted that a door in a bedroom "sticks at the top," another way of saying "out of square." Accordingly, the same evidence of structural movement noted in the Adams Report was provided to Lesieur in the NPI Report. Moreover, the inspectors who prepared the reports, with regard to the sections entitled "Foundation," checked the boxes denoting that the foundation had been "Inspected," but neither checked the box suggesting the foundation was "Not Functioning or In Need of Repair." Thus, neither inspector believed the home's foundation was currently unsound or in a state of disrepair.

We are aware that under the applicable standard of review, we must indulge every reasonable inference in favor of Lesieur. This indulgence, however, does not require that we parse individual words, nor does it require that we ignore that cracking in the interior of a home is, axiomatically, the result of movement. Thus, an assertion of structural movement–as evidenced by cracking in walls, ceilings, and floors–is no different than an assertion of stress or settlement cracking, particularly when that cracking is described as indicative of "what is occurring on the [foundation] itself."

We agree with Lesieur that the Adams Report referred to a visibly unlevel floor in one of the bedrooms, but no such reference was made in the NPI Report. We hold this does not raise a fact issue as to Lesieur's knowledge versus that of the Fryars and Morales Realty. It is undisputed that

Lesieur conducted a personal walk-through of the house before closing. If a floor was "visibly unlevel," he would have had personal knowledge of it based on his walk-through.

Accordingly, we hold that even when every reasonable inference is indulged in his favor, Lesieur failed to present more than a scintilla of evidence that either the Fryars or Morales Realty "*knew anything more or different than [he] did about the condition of the home[,]*" specifically the foundation. *See id.* (emphasis added). The differences in the reports upon which Lesieur relies are insufficient to create a fact issue as to whether the Fryars and Morales Realty knew something more or different about the house than did Lesieur. In other words, despite the slight variations in the technical terminology used by the two inspectors in the reports, the information provided to Lesieur by the NPI report afforded him the same level of warning with regard to the structural condition of the house that the Adams report would have provided if it had been disclosed. This is all that is required under *Lim* to defeat the elements of causation and reliance. *See id.* Because the information concerning the foundation of the house was equally available to all parties, the Fryars and Morales Realty negated the elements of causation and reliance as a matter of law, and therefore the trial court properly granted summary judgment in their favor.

Lesieur argues *Lim* actually supports his position, arguing that in *Lim* we relied on a case from the Dallas Court of Appeals, *Dubow v. Dragon*, 746 S.W.2d 857 (Tex. App.—Dallas 1988, no writ), to reach our conclusion. Lesieur contends that *Dubow*, as interpreted by several subsequent cases, holds that causation and reliance are not negated as a matter of law unless the evidence establishes: (1) the buyer relied solely on a pre-purchase inspection, which revealed the defect that subsequently forms the basis of the buyer's suit, and (2) there is a renegotiation of the sales contract based on the defect, establishing the buyer's knowledge that this was part of the basis of the parties'

bargain. *See Bernstein v. Thomas*, 298 S.W.3d 817, 822-23 (Tex. App.—Dallas 2009, no pet.); *Kupchynsky v. Nardiello*, 230 S.W.3d 685, 688-89 (Tex. App.—Dallas 2007, pet. denied); *Fernandez v. Schultz*, 15 S.W.3d 648, 652 (Tex. App.—Dallas 2000, no pet.). According to Lesieur, because there was no evidence he relied exclusively on the NPI report, there was no renegotiation based on foundation defects, and no reduction in sales price or inclusion in the contract of terms relating to the foundation, causation and reliance were not negated as a matter of law pursuant to *Dubow* and its progeny.

We agree with Lesieur's interpretation of *Dubow*, as construed by *Bernstein*, *Kupchynsky*, and *Fernandez*. Clearly, the Dallas Court of Appeals requires a party attempting to negate causation and reliance based on a buyer's pre-purchase inspection to prove (1) the buyer relied solely on the pre-purchase inspection, which revealed the defect that ultimately forms the basis of the buyer's suit, and (2) there was a renegotiation of the contract based on the existence of the defect, thereby establishing the buyer's knowledge of the defect. *See id.* However, we disagree that this court's opinion in *Lim* is based on *Dubow*, or that this court has adopted its more stringent requirements.

In reaching our conclusion that the Lims could not recover because the evidence showed the parties had the same information concerning the defect that formed the basis of the suit, we did not cite *Dubow* for support. *Lim*, 2007 WL 2428078, at *4. If we had intended to rely on *Dubow*, as interpreted in *Fernandez* and *Kupchynsky* (cases decided before *Lim*) and adopted its requirements, we certainly would have cited it, and would have required proof as a matter of law of the requirements stated therein. If we had intended to adopt the requirements of *Dubow* and its progeny, we would not have reached the conclusion we did, because there was no evidence of a renegotiation based on the defect for which the Lims brought suit. *Id.* at *1. Contrary to Lesieur's interpretation,

the renegotiation was based on replacing a single panoramic window, not repairs to prevent extensive water penetration. *Id.*

This court's holding in *Lim* in favor of the realtor was based simply on the fact that the same information available to the realtor was available to the buyer–there was no evidence the realtor knew anything more than the buyer. *Id.* at *4. Unlike our sister court, we did not hold that a pre-purchase inspection negates causation and reliance only when there is evidence the buyer relies solely on his inspector's report, the buyer knows about the defect because of his inspection and renegotiates the contract based on that awareness. Accordingly, we rely on *Lim*, and respectfully disagree with the approach of our sister court.

Because the trial court's summary judgment in favor of the Fryars and Morales Realty was proper based on Lesieur's pre-purchase inspection, we need not address his issues challenging the summary judgment on any other grounds. *See, e.g., Dow v. Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989) (holding that when trial court's order granting summary judgment does not specify ground or grounds relied upon for its ruling, summary judgment will be affirmed on appeal if any of theories advanced are meritorious)); *O'Donnell v. Smith*, 234 S.W.3d 135, 140 (Tex. App.—San Antonio 2007), *aff'd*, 288 S.W.3d 417 (Tex. 2009).

### *Attorney's Fees*

Morales Realty counterclaimed for attorney's fees and moved for summary judgment on the counterclaim. The trial court granted the motion for summary judgment, and in its order the trial court specifically stated it was granting the motion based on the Farm and Ranch Contract between

Lesieur and the Fryars.[6]  Lesieur contends the trial court erred in granting Morales Realty's motion

for summary judgment based on their counterclaim for attorney's fees.  We agree.

In support of its motion for summary judgment, Morales Realty relied upon paragraph

seventeen of the Farm and Ranch Contract:

> ATTORNEY'S FEES: The prevailing party in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all cost of such proceeding incurred by the prevailing party.

Lesieur argues this provision will not support an award of attorney's fees to Morales Realty

because Morales Realty was not a party to the contract; rather, Morales Realty had a separate

agreement with the Fryars for fees.  Morales Realty contends it was a party to the contract, either

directly or as a third-party beneficiary, but even if it were not, the contractual provision regarding

recovery of attorney's fees is not conditioned upon being a party to the contract.  Rather, the

provision entitles any prevailing party in a legal proceeding related to the contract to attorney's fees.

As the prevailing party in this matter, which was a legal proceeding related to the contract, Morales

Realty contends the trial court correctly granted its motion for summary judgment.

---

[6] Morales Realty also moved for summary judgment on the ground it was entitled to attorney's fees under the DTPA because Lesieur's suit was groundless, brought in bad faith, or brought for purposes of harassment. *See* TEX. BUS. & COM. CODE ANN. § 17.50(c) (Vernon Supp. 2009) (stating that if trial court finds DTPA action was "groundless in fact or law or brought in bad faith, or brought for the purpose of harassment," the court shall award defendant reasonable and necessary attorney's fees and costs).  However, Lesieur moved for summary judgment on this issue, and the trial court granted his motion.  Morales Realty did not perfect an appeal nor has it raised a cross-point related to its request for fees under section 17.50(c).  Therefore, we need only consider whether the trial court erred in granting attorney's fees to Morales Realty based on the contract between Lesieur and the Fryars.

Generally, to enforce a contract, the person or entity seeking to enforce it must be either a party to the contract or a third-party beneficiary to it.[7] *See, e.g., In re El Paso Refinery, L.P.*, 302 F.3d 343, 353-54 (5th Cir. 2002) (applying Texas law and holding nonparty to contract could not defend against contribution claims for environmental cleanup by relying on contract provision governing allocation of same between parties to contract); *Basic Capital Mgmt. v. Dynex Commercial, Inc.*, 254 S.W.3d 508, 515 (Tex. App.—Dallas 2008, pet. granted) (holding third-party stranger to contract may enforce its terms only if he was third-party beneficiary); *El Paso Community Partners v. B&G/Sunrise Joint Venture*, 24 S.W.3d 620, 626 (Tex. App.—Austin 2000, no pet.) (holding that generally someone who is not party to agreement has no interest in terms of agreement). Accordingly, before a court construes a provision in the contract to determine whether it entitles the person or entity to relief, it must first determine whether the person or entity seeking to enforce the contract provision it is in fact a party or third-party beneficiary to the contract. Accordingly, before we determine whether Morales Realty is entitled to recover pursuant to the attorney's fees provision in the Farm and Ranch Contract, we must first find they are parties or third-party beneficiaries to it.

As to whether Morales Realty is an actual party to the contract, we hold the contract, by its terms, defines the parties to the contract as only the buyer and seller. *See Williamson v. Guynes*, No.

---

[7] There are, of course, exceptions to this rule. *See, e.g., In re Merrill Lunch Trust Co. FSB*, 235 S.W.3d 185, 194 (Tex. 2007) (noting, in context of arbitration, Texas has long recognized nonparties may be bound to contract under traditional contract rules like agency or alter ego); *In re Weekley Homes*, 180 S.W.3d 127, 131-35 (Tex. 2005) (holding that principles of equitable estoppel and agency may bind nonsignatories to arbitration agreement); *In re Kellogg Brown & Root*, 166 S.W.3d 732, 739 (Tex. 2005) (holding nonsignatories may be bound to arbitration agreement under "direct benefits estoppel"). These exceptions, however, generally occur in the arbitration context, which is not applicable here.

10-03-00047-CV, 2005 WL 675512, at *1 (Tex. App.—Waco Mar. 23, 2005, no pet.) (mem. op.).

On the first page of the contract, the first paragraph provides:

> 1. PARTIES: <u>Timothy Fryar and Sandra Fryar</u> (Seller) agrees to sell and convey to <u>GEORGE LESIEUR AND DIANA LESIEUR</u> (Buyer) and Buyer agrees to buy from Seller the Property described below.

We interpret this provision of the contract as a definitional rather than merely a descriptive provision. Accordingly, the contract defines the parties as including only the Fryars as sellers and the Lesieurs as buyers. There is nothing else in the contract discussing or defining the parties.

Morales Realty points out that Gonzalez signed the contract. However, she did so only as the listing broker in a very specific portion of the contract. She did not sign the page where the buyer and the seller signed, nor did she initial any specific provision or page in the contract; rather, Gonzalez, as the listing broker, signed only that provision regarding the ratification of the broker's fee, thereby obligating her to pay Lesieur's broker three percent of the total sales price at closing.

With regard to third-party beneficiary status, there are two types of third-party beneficiaries who can enforce the terms of a contract, a donee or creditor beneficiary. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). "One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation." *Id.* If the promised performance will come to him "in satisfaction of a legal duty owed to him," he is a creditor beneficiary. *Id.* There is a presumption against conferring third-party beneficiary status on noncontracting parties. *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) (citing *MCI Telecomms. Corp.*, 995 S.W.2d at 652; *see Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 199 (Tex. 2007) (citing *Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503-04 (Tex. 1975) (noting there is presumption that parties contract for themselves

and not for third-party beneficiaries)). Therefore, any doubts as to whether a party is a third-party beneficiary are resolved against the existence of a third-party beneficiary. *Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 543 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). In deciding whether a third party may enforce a contract between others, the contracting parties' intent controls. *Lomas*, 223 S.W.3d at 306 (citing *Corpus Christi Bank & Trust*, 525 S.W.2d at 503-04). The parties to the contract must intend to confer a direct benefit upon the alleged third-party beneficiary, and that intent "must be clearly and fully spelled out or enforcement by the thirty party must be denied." *Lomas*, 223 S.W.3d at 306 (quoting *MCI Telecomms. Corp.*, 995 S.W.2d at 651). The fact that incidental benefits may flow from a contract to a third party does not confer third-party beneficiary status on that party that would allow him to enforce the contract. *Lomas*, 223 S.W.3d at 306 (citing *MCI Telecomms. Corp.*, 995 S.W.2d at 652). A third party may only enforce a contract when the parties to the contract "intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit." *Lomas*, 223 S.W.3d at 306 (citing *MCI Telecomms. Corp.*, 995 S.W.2d at 651; *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002)).

In this case, there is no evidence to establish the Lesieurs and the Fryars intended to confer a direct benefit upon Cynthia Morales, doing business as Morales Realty, or Gonzalez. They clearly did not enter into the contract for the sale of the property directly for the benefit of the realtors. In fact, paragraph eight of the contract affirmatively belies the possibility that the Lesieurs and the Fryars intended to confer a direct benefit upon Cynthia Morales, doing business as Morales Realty, or Gonzalez. That paragraph is entitled "BROKERS' FEES" and states, "All obligations of the parties for payment of brokers' fees are contained in a separate written agreement." Accordingly, there was no intent the realtors directly benefit from the contract; rather, there was a separate

agreement for their benefit. That the contract authorized the escrow agent to pay the brokers' fees directly from the closing proceeds does not establish a specific intent to secure a direct benefit; rather, that was merely an incidental benefit flowing from the contract, which *Lomas* held was insufficient to confer third-party beneficiary status.

Accordingly, we hold that because Morales Realty did not establish it was a party or third-party beneficiary to the contract, it was not entitled to rely on or enforce the attorney's fees provision. The trial court erred in granting summary judgment in favor of Morales Realty on its counterclaim for attorney's fees.

## CONCLUSION

Based on the foregoing we hold: (1) the trial court properly granted summary judgment in favor of the Fryars and Morales Realty on Lesieur's substantive claims; and (2) the trial court erred in granting summary judgment in favor of Morales Realty on its counterclaim for attorney's fees. Accordingly, we affirm the portion of the judgment granting summary judgment in favor of the Fryars and Morales Realty on Lesieur's substantive claims, and ordering that he take nothing, but reverse and render judgment that Cynthia Morales d/b/a Morales Realty and Cynthia Gonzales take nothing on their counterclaim for attorney's fees.

Marialyn Barnard, Justice